# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

BEAN DREDGING, LLC, *et al.*,

    *Plaintiffs*,

v.

UNITED STATES OF AMERICA,

    *Defendant*.

Civil Action No. 08-01508 (CKK)

## MEMORANDUM OPINION
### (March 29, 2011)

Plaintiff Bean Dredging, LLC[1] ("Bean Dredging") commenced this action seeking

judicial review of the decision by the National Pollution Funds Center (the "NPFC") to deny

Bean Dredging's claim for reimbursement of costs and damages incurred in connection with an

oil pollution incident in Humboldt Bay, California in September 1999.  The matter previously

came before this Court on the parties' cross-motions for summary judgment.  The Court resolved

those cross-motions and remanded to the NPFC to provide further explanation as to its

interpretation of the applicable regulations and the basis for its reasoning.  The agency has

completed its review on remand and the matter now returns to this Court on the parties' new

cross-motions for summary judgment.  Presently before the Court are Bean Dredging's [30]

Motion for Summary Judgment and the United States' [31] Motion for Summary Judgment.

Based upon a searching review of the parties' submissions, the administrative record, the relevant

authorities, and the record as a whole, the Court shall DENY Bean Dredging's [30] Motion for

---

[1] Bean Dredging's underwriters-in-interest are also named as plaintiffs in this action, but for purposes of convenience, the Court shall simply refer to all the plaintiffs in this case as "Bean Dredging."

Summary Judgment, GRANT the United States' [31] Motion for Summary Judgment, and DISMISS this action in its entirety.[2]

## I. BACKGROUND

The Court assumes familiarity with its prior opinion in this action, which sets forth in detail the factual and procedural background of this case, *see Bean Dredging, LLC v. United States*, 699 F. Supp. 2d 118 (D.D.C. 2010), and shall therefore only address the factual and procedural background necessary to address the discrete issues currently before the Court.

### A.    *Statutory and Regulatory Background*

Congress passed the Oil Pollution Act of 1990 (the "OPA"), 33 U.S.C. § 2701 *et seq.*, in response to the Exxon Valdez oil spill in Prince William Sound, Alaska. *Water Quality Ins. Syndicate v. United States*, 522 F. Supp. 2d 220, 226 (D.D.C. 2007). The statute, which lays out a comprehensive framework for assessing liability for costs and damages associated with oil spills, was intended "to streamline federal law so as to provide quick and efficient cleanup of oil spills, compensate victims of such spills, and internalize the costs of spills within the petroleum industry." *Rice v. Harken Exploration Co.*, 250 F.3d 264, 266 (5th Cir. 2001).

Title I of the OPA assigns liability to the owners and operators of vessels that discharge oil into the navigable waters of the United States. The statute provides, in relevant part, that "each responsible party for a vessel or a facility from which oil is discharged . . . into or upon the navigable waters or adjoining shorelines . . . is liable for the removal costs and damages . . . that result from such an incident." 33 U.S.C. § 2702(a). This includes all removal costs incurred by

---

[2]  Bean Dredging requests that oral argument be had on the instant motions; the Court concludes that the issues presented are properly resolved on the parties' briefing and that oral argument would not aid the Court in rendering its decision.

the United States government and certain removal costs incurred by third parties. *Id.* § 2702(b). In certain circumstances, however, a responsible party may seek to limit its financial liability and secure reimbursement for costs incurred. *Id.* §§ 2704, 2708. To do so, the responsible party must submit a claim directly to the Oil Spill Liability Fund. *Id.* § 2713(b)(1)(B). The NPFC, which is part of and administered by the United States Coast Guard (the "Coast Guard"), which is in turn a component part of the Department of Homeland Security, is responsible for processing claims for reimbursement under the OPA. The Coast Guard has enacted a comprehensive set of regulations governing the procedures for presenting, filing, processing, settling, and adjudicating such claims. *See* 33 C.F.R. § 136.1 *et seq.* The NPFC may deny a claim for reimbursement where certain conditions are not met; as is particularly relevant to the instant action, a responsible party is not eligible for reimbursement if "the incident was proximately caused by . . . the violation of an applicable Federal safety, construction or operation regulation by[] the responsible party, an agent or employee of the responsible party, or a person acting pursuant to a contractual relationship with the responsible party." 33 U.S.C. § 2704(c)(1)(B).

### B.     The Humboldt Bay Oil Spill and Removal Costs

This action has its origins in an oil spill that occurred on September 6, 1999 in Humboldt Bay, California. *See Bean Dredging*, 699 F. Supp. 2d at 121. Bean Dredging was the operator of the Dredge Stuyvesant (the "Stuyvesant"), the vessel involved in the incident. *Id.* The Stuyvesant, a hydraulic hopper dredge, was performing maintenance dredging at the Outer Bar channel of the entrance to Humboldt Bay at the time of the incident. *Id.*

The immediate cause of the oil spill is not in dispute. The parties agree that the incident

was due to oil spilling out of a fifteen-inch fracture in the hull plate of the Stuyvesant's fuel oil

tank, almost certainly resulting from the starboard dredge head hitting the fuel oil tank as the

vessel executed a turn to port during its dredging operations at approximately 6:00 p.m. on

September 6, 1999.  *See Bean Dredging*, 699 F. Supp. 2d at 121-22.  As reflected in the Coast

Guard's Marine Casualty Investigative Report (the "MCIR"), the incident was likely caused by

bad weather and an error in judgment by the vessel's crew.  *Id.* at 122.

The oil spill was first noticed around 7:10 p.m. on September 6, 1999, at which point the

Stuyvesant immediately notified the Coast Guard and the National Response Center.  *See Bean

Dredging*, 699 F. Supp. 2d at 122.  Precautions were taken to minimize the impact of the spill.

*Id.*  By early the following morning, the fuel oil had been contained and the Coast Guard allowed

the Stuyvesant to return to shore for repairs.  *Id.*  The Coast Guard estimated that approximately

2,100 gallons of fuel oil were discharged into the surrounding waters.  *Id.*  Bean Dredging

contends that it subsequently incurred $8.5 million in uncompensated removal costs and has

agreed to pay an additional $7.8 million as part of a settlement.  *Id.*

*C*.    ***The Initial Administrative Proceedings***

On September 2, 2005, Bean Dredging filed a claim with the NPFC seeking

reimbursement for removal costs and damages incurred in connection with the Humboldt Bay oil

spill.  *See Bean Dredging*, 699 F. Supp. 2d at 122.  Bean Dredging sought approximately $11.7

million in reimbursement.  *Id.*  On December 14, 2006, the NPFC denied the claim based in part

upon its determination that the spill had been caused by the Stuyvesant's violation of two federal

operating and safety regulations—specifically, 46 C.F.R. § 44.340 and 46 C.F.R. § 42.09-1.[3]

A.R. 1-10.[4]  The former regulation provides, in relevant part, that "[e]ach hopper dredge assigned a working freeboard may be operated at drafts from the normal freeboard to the working freeboard if the . . . [s]eas are not more than 10 feet."  46 C.F.R. § 44.340(a)(1).  The latter regulation provides, in relevant part, that "[t]he master of the vessel for which a load line certificate has been issued shall be responsible for the maintenance of such certificate on board such vessel and for compliance with its terms and conditions."  *Id.* § 42.09-1(c).  In this case, the Stuyvesant's load line certificate provided that it could be operated at its working freeboard in seas with "[n]ot more than 3 meter waves."  A.R. 115.  Because the parties are in agreement that the difference between the ten-foot limitation in the first regulation and the three-meter limitation in the load line certificate is immaterial as applied to the facts of this case, the two regulations are essentially coextensive for purposes of the instant litigation.  *See Bean Dredging*, 699 F. Supp. 2d at 124 n.8.  Therefore, as framed by the parties, the operative question is whether the Stuyvesant was operating in "seas" greater than ten feet at the time of the incident.

On June 6, 2007, Bean Dredging sought reconsideration of the NPFC's initial denial of the claim.  *See Bean Dredging*, 699 F. Supp. 2d at 123.  Bean Dredging tendered two principal arguments: first, Bean Dredging argued that the Stuyvesant was not operating in violation of the regulations identified above; second, Bean Dredging argued that the NPFC's decision contradicted the Coast Guard's MCIR.  A.R. 1751-53.  With respect to the first argument, Bean

_____

[3]  While Bean Dredging disputed the applicability of the regulations before the NPFC, it is undisputed for purposes of the instant action that both regulations applied to the Stuyvesant at the time of the spill.  *See Bean Dredging*, 699 F. Supp. 2d at 123 n.7.

[4]  References to "A.R." are to the administrative record in this action.

Dredging asserted that the term "seas," as used in 46 C.F.R. § 44.340(a)(1), was intended to refer to "significant wave height," A.R. 1752, defined as the average height of the highest one-third of waves encountered over a specified period of time, *see Bean Dredging*, 699 F. Supp. 2d at 123. In support of its request for reconsideration, Bean Dredging conceded that the Stuyvesant was operating in seas that at times encountered waves in excess of ten feet, but nevertheless maintained that the evidence did not show that the vessel was operating in seas with a significant wave height in excess of ten feet. A.R. 1752-53. With respect to the second argument, Bean Dredging reasoned that, because the Coast Guard's MCIR did not reflect that violations of federal operating or safety regulations had occurred, the NPFC's determination to the contrary was in error. A.R. 1751.

On November 13, 2007, the NPFC issued its final decision affirming the denial of Bean Dredging's claim. A.R. 12-25. With respect to Bean Dredging's first argument, concerning the interpretation of the term "seas," the NPFC implicitly rejected the argument by making no attempt to determine whether the "significant wave height" at the time of the incident was in excess of ten feet and by concluding, without reference to a specific frequency requirement, that the Stuyvesant was in violation of the regulation because the vessel had operated in seas with waves in excess of ten feet. A.R. 20-23. There was, however, no direct explanation as to why the NPFC rejected Bean Dredging's proffered interpretation of the relevant regulation. A.R. 12-26. With respect to Bean Dredging's second argument, the NPFC rejected the suggestion that it was bound by statements or findings in the MCIR, and noted that the mere fact that the Coast Guard elected to institute an administrative penalty against Bean Dredging in lieu of pursuing all possible regulatory violations did not establish the Stuyvesant's compliance with the applicable

regulations.  A.R. 20.

**D.      *The Present Action Before Remand***

Bean Dredging commenced this action on August 28, 2008, seeking judicial review of the

NPFC's final decision denying its claim for reimbursement under the OPA.  *See* Compl., Docket

No. [1].  On June 5, 2009, the parties filed cross-motions for summary judgment.  *See* United

States of America's Mem. in Supp. of Mot. for Summ. J., Docket No. [19-2]; Pl.'s Mem. of P. &

A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Mem."), Docket No. [20].  Oppositions were filed.

*See* United States of America's Resp. to Pl.'s Mot. for Summ. J., Docket No. [23]; Pl.'s Mem. of

P. & A. in Opp'n to Def.'s Mot. for Summ. J., Docket No. [22].  Bean Dredging filed a reply; the

United States did not.  *See* Pl. Bean Dredging LLC's Reply Mem. in Supp. of its Mot. for Summ.

J., Docket No. [24].

On March 30, 2010, this Court issued a decision resolving the parties' cross-motions for

summary judgment.  *See Bean Dredging*, 699 F. Supp. 2d at 118-30.  As on the administrative

level, Bean Dredging tendered two principal arguments in support of its contention that the

NPFC's decision to deny its claim for reimbursement was arbitrary or capricious.  First, Bean

Dredging argued that the NPFC "erred when it misinterpreted and misapplied the meaning of the

term 'seas' in 46 C.F.R. § 44.340(a)(1)."  Pl.'s Mem. at 14.  Second, Bean Dredging argued that

the NPFC's decision was arbitrary or capricious because it contradicted the Coast Guard's

findings in the MCIR.  *Id.* at 20.

With respect to the first argument, the Court noted that "while it is apparent from review

of the NPFC's decision that it rejected Bean Dredging's position, the record is devoid of any

explanation as to the reasons for this rejection."  *Bean Dredging*, 699 F. Supp. 2d at 127.  The

Court continued:

> Although it appears that the NPFC interpreted the regulations at issue to prohibit the operation of a vessel in seas without reference to any specific frequency requirement, there is no actual discussion in the record indicating how the NPFC itself defines "seas" of more than 10 feet, as that phrase is used in 46 C.F.R. § 44.340(a)(1). This is particularly significant because the regulation itself is ambiguous; it does not include any definition of the term "seas" and . . . the term "seas" may have different connotation to different people, *i.e.*, wave height, swell height, combined wave height, wind wave height, etc.

*Bean Dredging*, 699 F. Supp. 2d at 127. Without "a forthright agency interpretation," the Court was unable to evaluate whether the NPFC's interpretation would be entitled to deference. *Id.* Similarly, without first knowing the precise contours of the NPFC's interpretation, the Court was unable to reach Bean Dredging's related arguments challenging the NPFC's evidentiary decisions regarding the weather conditions in Humboldt Bay at the time of the incident. *Id.* at 128 n.11. Therefore, the Court was compelled to remand the action "for further explanation as to the interpretation of the relevant regulations [the NPFC] adopted and its reasons for rejecting the interpretation advanced by Bean Dredging." *Id.* at 128. The Court's opinion did not otherwise specify or restrict the scope of the agency's review on remand.

While the Court required further information before it could opine on the merits of Bean Dredging's first argument, the same was not true of Bean Dredging's second argument—namely, that the NPFC's decision was arbitrary or capricious because it was inconsistent with the Coast Guard's MCIR. The Court rejected this argument for two independent reasons. First, the MCIR did not contradict the NPFC's final decision; rather, its findings were "entirely consistent" with the NPFC's determination that the Stuyvesant had been operating in seas with waves in excess of ten feet at the time of the spill and that this was the proximate cause of the incident. *See Bean*

*Dredging*, 699 F. Supp. 2d at 128.  Second, even assuming that the MCIR's silence as to whether

the Stuyvesant was in violation of the regulations relied upon by the NPFC could be read as an

affirmative indication that there were no violations, the NPFC "was under no obligation to reach

the same conclusions as reflected in the MCIR." *Id.* at 129.  That is, "the NPFC is not bound by

such reports of investigation," Use of Reports of Marine Casualty in Claims Process by the

National Pollution Funds Center, 71 Fed. Reg. 60,553, 60,554 (Oct. 13, 2006), and "can reach

not only different facts but also different opinions or conclusions than the opinions and

conclusions in the MCIR," Use of Reports of Marine Casualty in Claims Process by National

Pollution Funds Center, 72 Fed. Reg. 17,574, 17,575 (Apr. 9, 2007).  Therefore, the NPFC was

"free to conduct a *de novo* review of the evidence and to reach its own conclusions." *Bean*

*Dredging*, 699 F. Supp. 2d at 129.  In light of these conclusions, the alleged inconsistency

between the NPFC's decision and the MCIR is no longer at issue in this action.[5]

### E.      *The Administrative Proceedings on Remand*

On remand, the NPFC revisited the question of the meaning of the term "seas," as used in

46 C.F.R. § 44.340(a)(1) and, on July 15, 2010, issued a supplemental determination reaffirming

---

[5] Nevertheless, in connection with the instant motions, Bean Dredging again speculates, in passing and in a footnote, that the reason why the Coast Guard did not cite violations of federal regulations in the MSIR was because it concluded that "there was insufficient evidence that the significant wave heights exceeded ten feet." Pl.'s Suppl. Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J., Docket No. [30], at 4.  For at least two reasons, the argument is without merit.  First, the Court "need not consider cursory arguments made only in a footnote." *Hutchins v. District of Columbia*, 188 F.3d 531, 539 n.3 (D.C. Cir. 1999) (en banc).  Second, Bean Dredging's argument rests on pure speculation and is therefore unpersuasive on the merits.  This Court previously observed that the assumption that the MCIR's silence as to whether the Stuyvesant was in violation of any regulations should be read as an affirmative indication that there were no violations is "questionable," *Bean Dredging*, 699 F. Supp. 2d at 128, and Bean Dredging has certainly pointed to no support in the administrative record to reach a contrary conclusion now.

its denial of Bean Dredging's claim for reimbursement. *See* Claim Summary/Determination Form ("Suppl. Determination"), Docket No. [29], at 1-14. Surprisingly, "[a]fter carefully considering the issue," the NPFC agreed with Bean Dredging's position that the term "seas" should be defined to mean "significant wave height," which the NPFC in turn defined as "the average height (trough to crest) of the highest one-third of waves encountered by the vessel." *Id.* at 9. However, the NPFC's current interpretation of the term differs in one respect from the one proffered by Bean Dredging; the NPFC maintains that significant wave height is to be determined in accordance with the informed observations of "a trained mariner" and is not reducible to *post hoc* data collection and mathematical computation. *Id.* at 9-11. In this view, "the significant wave heights encountered by a vessel can be determined by a mariner who observes the waves." *Id.* at 11. After justifying the basis for this interpretation, the NPFC proceeded to explain in detail why, in its judgment, Bean Dredging still failed to establish that it was not in violation of the relevant regulations. *Id.* at 12-14.

### F.    *The Instant Motions*

Following remand, the parties brought new cross-motions for summary judgment. On August 27, 2010, the parties filed their opening memoranda. *See* Pl.'s Suppl. Mem. of P. & A. in Supp. of Pl.'s Mot. for Summ. J. ("Pl.'s Suppl. Mem."), Docket No. [30]; United States of America's Second Mem. of Law in Supp. of Mot. for Summ. J. ("Def.'s Suppl. Mem."), Docket No. [31-1]. Both parties declined to file opposition and reply memoranda. *See* Joint Notice in Lieu of Further Pleadings, Docket No. [32]. The motions are therefore fully briefed and ripe for adjudication.

## II.  LEGAL STANDARD

Both parties agree that the NPFC's decision to deny Bean Dredging's claim for reimbursement is properly analyzed under the "arbitrary or capricious" standard set forth in the Administrative Procedure Act (the "APA"), pursuant to which the reviewing court must "set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  Bean Dredging, as the party challenging the agency action, bears the burden of proof.  *Abington Crest Nursing & Rehab. Ctr. v. Sebelius*, 575 F.3d 717, 722 (D.C. Cir. 2009) (citing *City of Olmsted Falls v. Fed. Aviation Admin.*, 292 F.3d 261, 271 (D.C. Cir. 2002)).  In assessing the merits of Bean Dredging's challenge, the Court begins with the presumption that the NPFC's action was valid.  *Grid Radio v. Fed. Commc'ns Comm'n*, 278 F.3d 1314, 1322 (D.C. Cir.), *cert. denied*, 537 U.S. 815 (2002).

Agency action must generally be affirmed on the grounds originally stated by the agency; a reviewing court may not attempt to supply "a reasoned basis for the agency's action that the agency itself has not given."  *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Nor may counsel's "*post hoc* rationalizations," offered for the first time on judicial review, substitute for an agency's obligation to articulate a valid rationale in the first instance.  *El Rio Santa Cruz Neighborhood Health Ctr., Inc. v. U.S. Dep't of Health & Human Servs.*, 396 F.3d 1265, 1276 (D.C. Cir. 2005).  Consistent with these principles, judicial review is typically confined to the administrative record before the agency at the time the decision was made.  *Envtl. Def. Fund, Inc. v. Costle*, 657 F.2d 275, 284 (D.C. Cir. 1981).

In order to avoid a finding that the challenged agency action was arbitrary or capricious,

the "agency must [have] examine[d] the relevant data and articulate[d] a satisfactory explanation for its action." *PPL Wallingford Energy LLC v. Fed. Energy Regulatory Comm'n*, 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43) (internal quotation marks omitted). In articulating the reason for its action, the agency "must have provided a 'rational connection between the facts found and the choice made.'" *Int'l Union, United Mine Workers of Am. v. Mine Safety & Health Admin.*, 626 F.3d 84, 90 (D.C. Cir. 2010) (quoting *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43). An agency's decision may be said to be arbitrary or capricious if any of the following apply: (i) its explanation runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference of view or the product of agency expertise; (ii) the agency entirely failed to consider an important aspect of the problem or issue; (iii) the agency relied on factors which Congress did not intend the agency to consider; or (iv) the decision otherwise constitutes a clear error of judgment. *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *accord Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1118 (D.C. Cir. 2010).

This standard of review is highly deferential to the agency; a court need not find that the agency's decision is "the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst., Inc. v. Am. Elec. Power Serv. Corp.*, 461 U.S. 402, 422 (1983). That is, it is not enough for the agency decision to be incorrect; so long as it has some rational basis, the court is bound to uphold the decision. *Hosp. of Univ. of Pa. v. Sebelius*, 634 F. Supp. 2d 9, 13 (D.D.C. 2009) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)). At bottom, the reviewing court is not entitled to substitute its judgment for that of the agency. *Overton Park*,

401 U.S. at 416.

In evaluating agency action under the "arbitrary or capricious" standard, the reviewing court must take "due account . . . of the rule of prejudicial error." 5 U.S.C. § 706. Just as the burden of establishing that the agency action is arbitrary or capricious rests with the party challenging agency action, so too must that party establish that the errors ascribed were prejudicial. *Jicarilla Apache Nation*, 613 F.3d at 1121 (citing *PDK Labs. Inc. v. U.S. Drug Enforcement Agency*, 362 F.3d 786, 799 (D.C. Cir. 2004)). The question of whether an error was prejudicial is necessarily contextual, and courts must proceed with a case-specific application based upon an examination of the entire record. *Jicarilla Apache Nation*, 613 F.3d at 1121. However, where the party challenging agency action fails to show that the agency's error may have affected the outcome of the proceedings below, the error is not prejudicial, and it would be senseless to vacate and remand for further proceedings. *Id.*

With these principles in mind, the Court turns to the merits of the instant motions.

### III. PRELIMINARY ISSUES

At the outset, the Court must address three threshold issues that, depending on their outcome, could very well have reverberations across the parties' cross-motions for summary judgment—namely, Bean Dredging's contention that the administrative proceedings on remand were procedurally defective, its suggestion that the NPFC exceeded the scope of this Court's remand order, and its assertion that the NPFC's decision to adopt a new interpretation of the relevant regulations renders its previous determination void *ab initio*. None of these arguments is meritorious.

### A.    The NPFC's Proceedings on Remand Were Not Procedurally Defective

With respect to the first issue, Bean Dredging's contention is this: "[b]y issuing a new

[d]etermination admitting that its prior interpretation of the critical terms 'seas' was

incorrect—but then making new findings of fact to justify the same outcome—the NPFC is

denying Bean Dredging an opportunity to properly litigate before the agency the question of

whether the vessel was operated lawfully under the correct standard."  Pl.'s Suppl. Mem. at 5.

The operative facts are not in dispute.  On remand, the NPFC revisited the question of the

meaning of the term "seas," as used in 46 C.F.R. § 44.340(a)(1), adopted an interpretation largely

consistent with the one previously proffered by Bean Dredging, and then nevertheless proceeded

to issue a supplemental determination reaffirming its denial of Bean Dredging's claim for

reimbursement without affording Bean Dredging an opportunity to submit any new information,

evidence, or argument in rebuttal.  Suppl. Determination at 1-14; *see also* Pl.'s Suppl. Mem. at 1-

2; Def.'s Suppl. Mem. at 2.  According to Bean Dredging, "as a matter of due process, the

Administrative Record should be reopened and Bean Dredging permitted to present further

factual evidence on that point."  *Id.*

For at least two reasons, the contention is unavailing: first, the Court finds no error in the

NPFC's course of conduct; and, second, even assuming that the NPFC erred, Bean Dredging has

failed to carry its burden of establishing that such error was prejudicial.

### 1.    Bean Dredging Had No Right to Submit New Information, Evidence, or Argument on Remand

Bean Dredging's contention that the proceedings on remand were procedurally defective

rests on the assumption that it had a right to introduce rebuttal evidence or argument on the

administrative level or to otherwise respond to the NPFC's supplemental determination.  The

assumption is erroneous. Neither the OPA, the accompanying regulations, the APA, nor "due process" required the NPFC to provide Bean Dredging with any more process than it received.

### i. The OPA

The logical starting point in determining the scope of Bean Dredging's rights in the claims adjudication process is with the OPA itself. However, while the OPA allows responsible parties to present a claim for reimbursement to the NPFC, they do not confer upon such parties a right to a formal hearing, a right to present rebuttal evidence or argument, or really any procedural rights at all, *see* 33 U.S.C. §§ 2704, 2708, 2713, an entirely unremarkable fact given that Congress' overarching intent in enacting the OPA was to "streamline" the claims adjudication process, *Rice*, 250 F.3d at 266. Regardless, Congress left it to the agency to flesh out the relevant procedural framework. *See* 33 U.S.C. 2713(e). Nothing in the OPA itself afforded Bean Dredging a right to submit any new information, evidence, or argument on remand.

### ii. The Accompanying Regulations

The next logical place to look is the regulatory framework accompanying the OPA, appearing at 33 C.F.R. pt. 136. But the regulations also lend no support to Bean Dredging's contention. Those regulations require the claimant to include "[e]vidence to support the claim" with its initial submission. 33 C.F.R. § 136.105(e)(6). The determination of whether any other information is "relevant and necessary to properly process the claim" is expressly vested in the "discretion" of the NPFC, not the claimant. *Id.* § 136.105(e)(13).

True, the regulations afford claimants a right to seek "reconsideration" of the NPFC's initial determination. 33 C.F.R. § 136.115(d). But even setting aside the fact that the regulation

has no applicability where, as here, the agency is revisiting its final decision upon remand from the district court, reconsideration may be requested "only . . . once for each claim denied," *id.*, and it is undisputed that Bean Dredging already availed itself of this right when it sought reconsideration of the NPFC's initial decision in June 2007, A.R. 1750-58.[6]

In sum, nothing in the regulations afforded Bean Dredging a right to submit any new information, rebuttal evidence, or argument on remand.

### iii.    The APA

Bean Dredging wisely concedes that the NPFC's review of a claim for reimbursement under the OPA is an informal adjudication, Pl.'s Mem. at 13; as explained above, the OPA does not require a formal hearing nor provide claimants with a right to present rebuttal evidence or argument. Notably, "[u]nlike other agency proceedings, the APA does not confer upon participants in informal adjudications the right to present [their] case or defense by oral or documentary evidence, to submit rebuttal evidence, or to conduct such cross-examination as may be required for a full and true disclosure of the facts." *New Life Evangelistic Ctr., Inc. v. Sebelius*, __ F. Supp. 2d __, 2010 WL 4880794, at *10 (D.D.C. Dec. 1, 2010) (internal quotation marks omitted and notations altered). Unfortunately for Bean Dredging, the APA "sets forth the full extent of judicial authority to review executive agency action for procedural correctness," *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, __ U.S. __, 129 S. Ct. 1800, 1810 (2009), and the APA simply does not confer upon participants in informal adjudications a right to

---

[6] Even assuming, *arguendo*, that Bean Dredging could seek reconsideration a second time, it has failed to point this Court to any evidence in the record suggesting that it satisfied the regulatory requirement that any "request for reconsideration . . . be in writing and include the factual or legal grounds for the relief requested, providing any additional support for the claim." 33 C.F.R. § 136.115(d).

supplement the evidentiary record or to submit countervailing evidence or argument.

### iv.    "Due Process"

Given the foregoing, it is unsurprising that Bean Dredging resorts to the notion of "due process" in support of its contention that it is entitled to an "opportunity to properly litigate before the agency," Pl.'s Suppl. Mem. at 5, but this avenue is foreclosed by decades of settled jurisprudence precluding courts from imposing upon agencies specific procedural requirements not contemplated by the governing statutory and regulatory framework.

In the seminal case of *Vermont Yankee Nuclear Power Corporation v. Natural Resources Defense Council, Inc.*, 435 U.S. 519 (1978), the Supreme Court held that a reviewing court may not impose upon the agency procedural requirements beyond those set forth by Congress or the agency itself. Describing agencies' freedom to fashion their own procedural rules as "the very basic tenet of administrative law," the Supreme Court cautioned that reviewing courts should not impose upon agencies their notion of which procedures are best. *Id.* at 524, 543-44, 549. These general principles were extended to the informal adjudication setting in *Pension Benefit Guaranty Corporation v. LTV Corporation*, 496 U.S. 633, 654 (1990), where the Supreme Court reiterated that "courts are not free to impose upon agencies specific procedural requirements that have no basis in the APA" or the governing legislation.

In *Process Gas Consumers Group v. Federal Energy Regulatory Commission*, 930 F.2d 926 (D.C. Cir. 1991), the United States Court of Appeals for the District of Columbia Circuit explained how these principles might apply to agency proceedings upon remand. There, the agency requested supplemental submissions from a party during remand proceedings, but denied a request by other participants for the disclosure of the materials behind those submissions. *Id.* at

929.  On review for the second time, the Court rejected the suggestion that the procedures on remand were unfairly structured, reasoning that agencies have broad discretion to decide what procedures to use in fulfilling their statutory responsibilities.  *Id.* at 929-30.

More recently, in *District No. 1, Pacific Coast District, Marine Engineers' Beneficial Association v. Maritime Administration*, 215 F.3d 37, 42-43 (D.C. Cir. 2000), the United States Court of Appeals for the District of Columbia Circuit rejected a claim that "fundamental fairness" may be used to create procedural rights where the APA and the relevant legislation envision none.  Echoing *Vermont Yankee*, the Court held that, in the absence of any statutory or self-imposed limitation, courts have "no jurisdiction" to review an agency's procedural decision about how best to make a decision committed to its discretion by law.  *Id.* at 43.  The Court also rejected the petitioner's attempt to side-step this limitation on the scope of judicial review by arguing that, once the agency requested additional information from some parties, it effectively forfeited its discretion to rely upon such information without first providing everyone an opportunity to respond.  *Id.*  Here too, the Court reasoned that the determination of how best to deal with such issues is a matter within the agency's discretion.  *Id.*

Simply put, the NPFC retained broad discretion on remand to decide whether, and if so how, to consider additional information in support of its determination.  Agencies are, of course, free to provide participants in administrative proceedings additional procedural rights as they see fit, but this Court is simply "without authority" to impose procedural requirements against the agency's will in the absence of a constitutional or statutory command or extremely compelling circumstances, none of which are present here.  *See Natural Res. Def. Council, Inc. v. Nuclear Regulatory Comm'n*, 216 F.3d 1180, 1190 (D.C. Cir. 2000).  The relief now sought by Bean

Dredging runs counter to decades of jurisprudence; the Court can see no reason (and Bean Dredging has certainly provided none) to depart from the commandments of the Supreme Court and the United States Court of Appeals for the District of Columbia Circuit in this case. In the final analysis, the NPFC did not act arbitrarily, capriciously, or otherwise not in accordance with law, nor abused its discretion, by adopting a new interpretation of the relevant regulatory language but nevertheless reaching the same final outcome, while simultaneously declining to allow Bean Dredging an opportunity to submit new information, evidence, or argument in rebuttal.

### 2. Bean Dredging Has Failed to Establish Prejudicial Error

Even assuming, *arguendo*, that the NPFC somehow erred on remand by failing to afford Bean Dredging an opportunity to provide additional information, evidence, or argument, Bean Dredging has failed to establish, as it must, that the ascribed error was prejudicial. *Jicarilla Apache Nation*, 613 F.3d at 1121. While Bean Dredging broadly avers that it should be permitted to present "further factual evidence" on the question of whether the significant wave height at the time of the spill exceeded ten feet, it fails to identify what "further factual evidence" it would have sought to introduce and how that evidence might have affected the outcome of the proceedings below. Pl.'s Suppl. Mem. at 6. At the same time, Bean Dredging cannot credibly deny that it already had the opportunity to, and in fact did, submit evidence concerning the significant wave height at the time of the incident and that such evidence was actually considered by the NPFC. In seeking reconsideration of the NPFC's initial decision in June 2007, Bean Dredging explicitly argued that there was no violation of the ten-foot significant wave height restriction, relying on the opinion of an expert meteorologist and oceanographer, weather

forecasts, buoy readings, deck log entries, the master's statements and affidavits, and the MCIR. A.R. 1751-52. Although Bean Dredging may disagree with the weight the NPFC ultimately afforded this evidence, it cannot dispute that the evidence has been considered by the agency. Suppl. Determination 1-14. Moreover, given the stakes involved and the nearly six months that passed between the NPFC's initial decision and the submission of Bean Dredging's request for reconsideration, the suggestion that Bean Dredging did not marshal all the evidence it could in support of its claim is suspect. Regardless, the critical point is that Bean Dredging has failed to identify what additional evidence it would submit for the NPFC's consideration if it were afforded another bite at the apple and how that evidence might affect the agency's decision. Having failed to make that showing, Bead Dredging has not carried its burden of establishing prejudicial error.

### B. The NPFC's Proceedings on Remand Were Consistent with the Court's Remand Order

To the extent Bean Dredging intends to suggest that the NPFC exceeded the scope of this Court's remand order, Pl.'s Suppl. Mem. at 1, the Court cannot agree. It is beyond dispute that a reviewing court may allow an agency to supplement the record with additional evidence and explanation following remand. *New Life Evangelistic Ctr.*, 2010 WL 4880794, at *7. Equally non-controversial, however, is the proposition that an agency's review on remand must be responsive to the court's mandate. *Process Gas Consumers Grp. v. Fed. Energy Regulatory Comm'n*, 292 F.3d 831, 840 (D.C. Cir. 2002). The only question here is whether the NPFC contravened this Court's remand order by adopting a new interpretation of the relevant regulatory language but nevertheless reaching the same ultimate decision after applying that interpretation to the facts of the case.

The Court's remand order instructed the NPFC to provide "further explanation of its interpretation of the term 'seas,' as it is used in 46 C.F.R. § 44.340, and its reasons for rejecting the interpretation advanced by Bean Dredging." Order (Mar. 30, 2010), Docket No. [25]. As this phrasing makes plain, the Court may not have expected the NPFC to adopt on remand an interpretation of the regulation largely consistent with the one previously proffered by Bean Dredging. However, that does not lead to the conclusion that the NPFC somehow contravened the Court's remand order. Nothing in the metes and bounds of the order precluded the NPFC from revisiting the wisdom of its interpretation on remand and, after finding that interpretation to be unsound as a matter of law or policy, to proceed to evaluate the impact, if any, on Bean Dredging's claim for reimbursement.

Meanwhile, an agency is not restricted from reopening administrative proceedings after the grounds upon which it once relied are drawn into question by the reviewing court. *PPG Indus., Inc. v. United States*, 52 F.3d 363, 366 (D.C. Cir. 1995). Similarly, when the reviewing court does not expressly require additional fact gathering on remand, "the agency is typically authorized to determine, in its discretion, whether such fact gathering is needed." *Chamber of Commerce of the U.S. v. Secs. & Exch. Comm'n*, 443 F.3d 890, 900 (D.C. Cir. 2006). Such an approach is consonant with the general preference to leave to the agency's discretion to decide how, in light of internal organizational considerations, it may best proceed upon remand. *Fed. Power Comm'n v. Transcon. Gas Pipe Line Corp.*, 423 U.S. 326, 333 (1976) (per curiam). In this case, the NPFC acted well within the scope of its discretion by applying its new interpretation to the facts of this case. Strictly speaking, the NPFC did not even reopen the administrative record to consider new evidence in support of its prior determination. As Bean

Dredging concedes, "[i]n its new [d]etermination, the NPFC has relied on the same evidence as in its prior adjudication." Pl.'s Suppl. Mem. at 7. Properly construed, the NPFC has simply revisited the legal contours for its decision and expanded upon its reasoning. This is not an abuse of discretion.

Notably, Bean Dredging never bothers to follow its argument to its logical conclusion. As an initial matter, the Court will give Bean Dredging the benefit of the doubt that it does not believe that the NPFC was somehow obligated to continue to argue in favor of an interpretation of a regulation relevant to the performance of its statutory duties after it decided that such an interpretation was no longer sustainable either as a matter of law or sound policy. But then only two alternatives remain: either the NPFC could adopt a new interpretation and apply that interpretation to the facts of the case, as it has done here, or adopt the new interpretation and go no further. Had the NPFC selected the latter avenue, there would be no final agency action for this Court to review—Bean Dredging's claim for reimbursement would lie in administrative limbo. The only result would be a further remand to allow the NPFC to apply its new interpretation to the facts surrounding Bead Dredging's claim for reimbursement, precisely what the NPFC has done here. Viewed from a slightly different perspective, were the Court to agree with Bean Dredging's position today, the only conceivable relief available to Bean Dredging would be a second remand to the NPFC to perform the same task. But there is "no need to compel an agency to go through the 'exercise of repeating a procedure according to rules where the result of the procedure is foreordained.'" *New Life Evangelistic Ctr.*, 2010 WL 4880794, at *9 (quoting *Wilkinson v. Legal Servs. Corp.*, 27 F. Supp. 2d 32, 63 (D.D.C. 1998)).

The Court concludes that the NPFC was permitted to exercise its discretion to adopt a

new interpretation, explain the basis for that interpretation, and then proceed to decide how that interpretation applied to Bean Dredging's claim for reimbursement. Its election to do so cannot be characterized as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### C. The NPFC's Denial of Bean Dredging's Claim Was Not Void Ab Initio

Bean Dredging also makes the curious argument that, by adopting a new interpretation of the relevant regulations on remand, the NPFC has admitted that its determination in November 2007[7] denying Bean Dredging's claim for reimbursement was "not in accordance with law." Pl.'s Suppl. Mem. at 4. From this, Bean Dredging posits that the determination was void *ab initio* and that it is entitled to vacatur of the determination. The contention is without merit.

"[W]ith or without vacatur, an agency that cures a problem identified by a court is free to reinstate the original result on remand." *Heartland Reg'l Med. Ctr. v. Leavitt*, 415 F.3d 24, 29-30 (D.C. Cir. 2005). That is, the agency may, "in the exercise of its lawful discretion, reach the same result for a different reason." *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 25 (1998). Therefore, the proper focus for this Court's inquiry is whether the NPFC's denial of Bean Dredging's claim for reimbursement upon remand is sustainable for the reasons stated in its supplemental determination and in light of the administrative record as a whole.

In assuming the contrary, Bean Dredging again fails to acknowledge the logical conclusion of its argument. Were its position to prevail, the mechanism of remand would be without purpose; once an agency made some error or strayed in some material respect, its action

---

[7] To the extent Bean Dredging also intends its argument to extend to the NPFC's initial determination in December 2006, that decision did not constitute final agency action and, as a result, is not subject to judicial review. 5 U.S.C. § 704.

would be irredeemable. Clearly, this is not the law. Courts "frequently remand matters to agencies while leaving open the possibility that the agencies can reach exactly the same result so long as they rely on the correct view of the law that they previously misinterpreted, or as long as they explain themselves better or develop better evidence for their position." *Nat'l Treasury Employees Union v. Fed. Labor Relations Auth.*, 30 F.3d 1510, 1514 (D.C. Cir. 1994).

Nothing in this Court's prior decision suggested that the denial of Bean Dredging's claim was irredeemable, and the NPFC's election to exercise its lawful discretion to adopt a new interpretation of the relevant regulations, explain the basis for that interpretation, and then proceed to decide how that interpretation applied to Bean Dredging's claim for reimbursement cannot be characterized as arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

## IV. DISCUSSION

With these preliminary issues resolved, and with the parties now in agreement that the term "seas," as used in 46 C.F.R. § 44.340(a)(1), should be read as referring to significant wave height, the controversy facing the Court is actually quite narrow. The questions that remain are whether the NPFC erred in making specific evidentiary determinations and whether its ultimate decision to deny Bean Dredging's claim for reimbursement was arbitrary or capricious. The Court shall begin by explaining why Bean Dredging's various challenges to the NPFC's evidentiary determinations are misplaced. The Court shall then turn to explaining why the NPFC's ultimate determination is neither arbitrary nor capricious.

### A. The NPFC Did Not Err in its Evidentiary Determinations

Bean Dredging takes issue with a number of evidentiary determinations made by the

NPFC in the course of denying Bean Dredging's claim for reimbursement. In each instance,

Bean Dredging fails to give due account to the scope of an agency's discretion to evaluate the

credibility and weight of evidence in the administrative record and to draw inferences therefrom.

In this case, none of the evidentiary determinations challenged by Bean Dredging was arbitrary,

capricious, an abuse of discretion, or otherwise not in accordance with law.

**1.      The NPFC Did Not Err By Finding the Master's Declaration Lacking in Credibility**

In support of its request for reconsideration, Bean Dredging relied in part on a 2007

declaration by the master of the Stuyvesant, in which the master declared that, at the time of the

incident in September 1999, the Stuyvesant was encountering twelve-foot seas every six to eight

minutes and that 90% of the waves were in the eight- to ten-foot range. A.R. 1798-99. While

the NPFC claims to have carefully considered the declaration in evaluating Bean Dredging's

claim, it ultimately found the declaration "lacked credibility" and gave it "no weight," reasoning

that the declaration, authored "[a]lmost eight years after the incident" was "unbelievable and

inconsistent" with the reports made by the master "much closer in the time" to the actual

incident. Suppl. Determination at 13. Here, Bean Dredging claims that the NPFC erred by

"summarily dismissing [the master's] sworn affidavit and finding it to be lacking in credibility."

Pl.'s Suppl. Mem. at 9. The argument is without merit.

As an initial matter, the NPFC plainly did not "summarily dismiss[]" the master's

declaration. Pl.'s Suppl. Mem. at 9. Rather, the NPFC considered the contents of the

declaration, the context in which it was made, and its relationship to other evidence in the record.

*See* Suppl. Determination at 13. It is beyond cavil that the NPFC made a considered and

informed determination as to the credibility of the master's declaration and Bean Dredging's

25

suggestion to the contrary simply has no foundation in the record.

Regardless, Bean Dredging's entire argument is predicated upon a misunderstanding as to the scope of this Court's review; absent clear error, "an agency's credibility decision normally enjoys almost overwhelming deference." *Sasol N. Am. Inc. v. Nat'l Labor Relations Bd.*, 275 F.3d 1106, 1112 (D.C. Cir. 2002). In this case, at least two separate considerations warrant deferring to the NPFC's credibility determination. First, it is undisputed that the declaration was prepared nearly eight years after the events in question, in the context of Bean Dredging's attempt to secure millions of dollars in reimbursement for removal costs. Under these circumstances, it was entirely reasonable for the NPFC to take the master's declaration *cum grano salis*. Second, drawing upon its expertise in the field, the NPFC reasonably concluded that the master's detailed after-the-fact recollection of the conditions facing the Stuyvesant at the time of the incident was not consistent with his prior, contemporaneous statements that the waves were "anywhere from 6 to 12 feet" or "anywhere from approx six to twelve feet (at times)." Suppl. Determination at 13 (citing A.R. 71, 77). The Court is in no position to second-guess the NPFC's finding that "a professional mariner with 19 years of licensed experience" would not describe conditions in this way if the vessel was actually encountering "12-foot seas every 6 to 8 minutes and that 90% of the waves were in the 8 to 10-foot range." *Id.*

Of course, this is not to say that the agency's credibility determination was the only one reasonably available. Understandably, Bean Dredging has its own views about how best to interpret the master's declaration and how it corresponds to the record as a whole. But the inquiry here is a limited one; it is not the reviewing court's role to evaluate credibility. Even if the reviewing court could have made a different choice had the matter been before it *de novo*, it

"may not substitute its own judgment for the agency's choice between two fairly conflicting views." *Siegel v. Secs. & Exch. Comm'n*, 592 F.3d 147, 155 (D.C. Cir.), *cert. denied*, __ U.S. __, 130 S. Ct. 3333 (2010). In the final analysis, the NPFC's determination to afford the master's declaration no weight was considered, informed, and reasonable. By logical extension, it cannot be said to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### 2. The NPFC Did Not Err In Its Consideration of the Opinion of Bean Dredging's Proffered Expert

In support of its request for reconsideration, Bean Dredging also relied in part upon an affidavit prepared by an expert meteorologist and oceanographer, Dr. Austin L. Dooley, Ph.D. ("Dooley"), engaged by Bean Dredging to provide an opinion on the subject of the significant wave heights facing the Stuyvesant at the time of the Humboldt Bay oil spill. A.R. 1806-12. Bean Dredging maintains that Dooley's opinion and the underlying data are consistent with and support its position that significant wave heights did not exceed ten feet at the time of the incident. Pl.'s Suppl. Mem. at 12. Because it is undisputed that the NPFC took into account Dooley's opinion and found that it "lacked a credible foundation or probative value," Suppl. Determination at 14, implicit in Bean Dredging's argument, but never fully articulated, is the suggestion that the NPFC somehow erred in its determination of the evidentiary weight to be accorded to Dooley's opinion. But the NPFC provided a sound and reasoned basis for discounting Dooley's opinion. It observed that Dooley relied upon two sources of information in rendering his opinion: (a) the master's 2007 declaration; and (b) data from buoys in the waters adjacent to Humboldt Bay. *Id.* The NPFC separately found that the master's 2007 declaration, prepared nearly eight years after the events in question, was "unbelievable and inconsistent," *id.*

at 13, a finding that was neither arbitrary nor capricious, *see supra* Part IV.A.1.  Meanwhile, the

NPFC determined that the data from buoys did not provide an accurate picture of the conditions

facing the Stuyvesant because the "data [were] from buoys that were 14 and 35 miles away from

the area where the incident occurred," Suppl. Determination at 14, which was in a particularly

volatile area of Humboldt Bay known as "rock and roll alley," *see infra* Part IV.A.4.  Reasoning

that "neither the Master's 2007 declaration nor the buoy data provided credible or reliable

evidence of the seas actually encountered by the vessel, the NPFC found that [] Dooley's

opinions lacked a credible foundation or probative value, and therefore deserved little evidentiary

weight."  Suppl. Determination at 14.  This evidentiary determination was considered, informed,

and reasonable, and Bean Dredging has failed to come forward with any reason for disregarding

it here.  Accordingly, the NPFC did not act arbitrarily, capriciously, or otherwise not in

accordance with law, or abuse its discretion, in affording Dooley's declaration and the underlying

data little weight in its final determination.

### 3.     The NPFC Did Not Err in its Assessment of the Master's Statements

Shortly after the Humboldt Bay oil spill, the master prepared two written statements

describing his account of what had transpired, the first providing that "[s]ea and swell conditions

were estimated to be anywhere from 6 to 12 feet" and the second providing that "[t]he sea and

swells were anywhere from approx six feet to twelve feet (at times)."  A.R. 71, 77.  In reaching

its final determination denying Bean Dredging's claim for reimbursement, the NPFC found the

master's statements, made "while [] circumstances were still fresh in everyone's mind," to be

"very credible" and accorded them "a significant amount of weight."  Suppl. Determination at

12.  Bean Dredging does not dispute that the master made these statements or contest that the

NPFC was free to consider them in the course of rendering its decision, but instead asserts that the NPFC has misinterpreted the master's statements and drawn the wrong inferences from those statements. Pl.'s Suppl. Mem. at 7-8. The argument is misplaced.

Bean Dredging first contends, relying upon its own written submissions to the agency, evidence outside the administrative record, treatises, and dated case law from beyond this Circuit, that "[i]t is commonly accepted by nautical experts that mariners' estimates of wave heights have a large margin for error," and then posits that the NPFC's purported reliance upon the master's statements as "precisely accurate" must be erroneous. Pl.'s Suppl. Mem. at 8. But Bean Dredging misapprehends the nature of the NPFC's consideration of the master's statements; the NPFC has never suggested that the master's statements should be read as precise measurements of the significant wave heights facing the Stuyvesant at the time of the incident. Indeed, even a cursory reading of the NPFC's supplemental determination would reveal that the NPFC did not consider the master's statements to be anything more than estimates. It provides, in relevant part, that "the Master's reports suggest that the significant wave heights at the time of the casualty exceeded the regulatory limit by *as much as* 2 feet" and that the master's "*estimates* of the seas should have *approximated* the significant wave heights encountered by the vessel." Suppl. Determination at 12 (emphasis added). The NPFC simply did not rely on the master's statements as definitive calculations of the significant wave heights at the time of the incident. To the extent Bean Dredging's argument hinges on this contention, it must fail.

Indeed, embedded in Bean Dredging's argument is a never fully articulated disagreement with the NPFC's underlying policy judgment that significant wave height is to be determined in accordance with the informed observations of "a trained mariner." Suppl. Determination at 9-11.

29

Citing to evidence in the administrative record concerning the historical development of the concept of significant wave height and the actual experience of mariners, the NPFC has concluded that "[a]lthough the height of the seas requires a mariner to exercise some judgment, it's an important skill that can be developed and applied consistently with practice." Suppl. Determination at 12. After bringing its expertise to bear on the subject, the NPFC has determined that "[r]equiring a complex analysis to determine seas under 46 C.F.R. § 44.340(a) would defeat the regulations' purpose and make it impossible to enforce." Suppl. Determination at 11. Distilled to its essence, the NPFC's reasoning in this regard is that mariners must make important safety decisions in the heat of the moment, using their knowledge, skill, and training; evaluating significant wave height through *post hoc* data collection and mathematical computation would ignore the fact that the regulations at issue are designed to prevent incidents such as the Humboldt Bay oil spill, not to provide guidance for apportioning liability for costs and damages *ex post facto*. *See id.* at 9-12. This strikes the Court as an eminently sensible policy judgment, one that is, in any event, allocated to the agency's discretion and not subject to second-guessing by a reviewing court. Furthermore, Bean Dredging simply has not come forward with any reason as to why it should not be honored.

Because Bean Dredging never expressly acknowledges this underlying disagreement, its remaining argument as to why the NPFC purportedly erred in evaluating the master's statement largely misses the mark. Bean Dredging argues that the master's statements did not "sufficiently quantif[y] the observed wave height to establish that the significant wave height exceeded ten feet." Pl.'s Suppl. Mem. at 9. The NPFC plainly disagreed, interpreting the master's statements characterizing the seas as ranging from six to twelve feet as "suggest[ive] that the significant

wave heights at the time of the casualty exceeded the regulatory limit by as much as 2 feet."

Suppl. Determination at 12. In arriving at this interpretation of the master's statements, the

NPFC observed that the master "had been a licensed deck officer since 1980 and a licensed

Master since 1990," and "should have been proficient at determining significant wave heights by

observing the sea conditions." *Id.* From this foundation, the NPFC determined that the master's

"estimates of the seas should have approximated the significant wave heights encountered by the

vessel." *Id.* That is, the NPFC took the master's statements as some evidence that the

significant wave heights facing the Stuyvesant exceeded the ten-foot regulatory restriction,

perhaps by as much as 20%.[8] *Id.*

Bean Dredging faults the NPFC for "embracing . . . their own subjective interpretation of

what the Master meant by" his statements. Pl.'s Suppl. Mem. at 9. But this contention totally

misapprehends the scope of the NPFC's discretion and the ambit of judicial review. The Court

does not doubt that conflicting inferences could be drawn from the master's statements.

However, that is not the question for this Court's review. "[A]n agency must have latitude to

draw permissible inferences from and to make findings based on the evidence in the record,"

*Mail Order Assoc. of Am. v. U.S. Postal Serv.*, 2 F.3d 408, 421 (D.C. Cir. 1993), and even if the

reviewing court would have made a different choice had the matter been before it *de novo*, it

"may not substitute its own judgment for the agency's choice between two fairly conflicting

---

[8] In reaching this conclusion, the NPFC expressly took into account the fact that the master's second written statement qualified his characterization of the seas facing the Stuyvesant as having waves of twelve feet "at times," concluding that the master's estimates that the seas were above ten feet were consistent with "the worsening sea conditions on the day of the incident" and that, as the day progressed, there were "a range of significant wave heights." Suppl. Determination at 12.

views," *Siegel*, 592 F.3d at 155. That is, the system of administrative action and judicial review fashioned by Congress vests in agencies the discretion to choose between competing inferences, provided that those inferences are reasonably based in the administrative record. For various reasons, the inference drawn by the NPFC in this instance was, if not the only one available, nevertheless a permissible one: the master's statements are sufficiently open-ended and leave considerable room for interpretation; the NPFC has explained why the master's nearly twenty-year experience as a mariner likely vested him with the knowledge, skill, and training to make reasonably accurate estimates as to the significant wave heights facing the Stuyvesant; the NPFC has explained why the significant wave height requirement historically has been, and as a matter of policy generally should be, viewed through the lens of the on-site estimates provided by trained mariners observing the seas, such as the master; and the NPFC's interpretation of the master's statements is consistent with other evidence in the administrative record indicating that weather conditions were worsening as the day progressed, were particularly severe in the specific area where the Stuyvesant was operating, and motivated the master to cut the Stuyvesant's operations short. Suppl. Determination at 4-6, 12. Under these circumstances, the Court cannot say that the agency's chosen interpretation of the master's statements was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### 4.        The NPFC Did Not Err in its Consideration of Weather Forecasts

Bean Dredging next takes issue with the NPFC's reliance upon weather forecasts—in particular, weather forecasts by the National Weather Service (the "NWS") and the Coast Guard. The argument is not without some irony, given that Bean Dredging introduced and relied upon these weather forecasts on the administrative level. A.R. 41. Regardless, Bean Dredging now

claims that the weather forecasts "do not prove the *actual* significant wave heights encountered by the vessel at the time of the incident." Pl.'s Suppl. Mem. at 10 (emphasis in original). The argument is a strawman. The NPFC has never suggested that the weather forecasts at issue are direct evidence of the significant wave heights encountered by the Stuyvesant at the time of the incident. *See Herbert v. Architect of Capitol*, __ F. Supp. 2d __, 2011 WL 637549, at *17 n.19 (D.D.C. Feb. 23, 2011) (providing that "direct evidence" is that which, if believed by the fact finder, establishes a fact in question without any need for an inference). Indeed, in its supplemental determination, the NPFC expressly provided that "[a]lthough the [] weather forecasts gave some notice of the general sea conditions to be expected, they were not definitive statements of sea conditions actually encountered by the vessel." Suppl. Determination at 13.

Nor was the NPFC's reliance on the weather forecasts otherwise erroneous. Beginning first with the forecasts by the NWS, which defines the term "seas" consistently with the significant wave height requirement, the NPFC relied upon NWS weather forecasts as circumstantial evidence of the conditions encountered by the Stuyvesant at the time of the incident. Early on the morning of the incident, the NWS reported that a twenty-nautical-mile area encompassing Humboldt Bay was expected to experience "seas 6 to 8 ft building to 8 to 10 ft." A.R. 97-98. That afternoon, the NWS reported a forecast for the same area that "combined seas [would be] 10 ft." A.R. 98. Plainly, if taken at face value, these forecasts do not show that the Stuyvesant faced seas with a significant wave height *in excess* of ten feet. But the NPFC provided a reasoned basis for concluding that these forecasts likely underestimated the significant wave height actually experienced by the Stuyvesant at the time of the incident. Specifically, the NPFC took into account the fact that the forecasts covered the twenty-nautical-mile area covering

Humboldt Bay, but did not target the conditions at the entrance to the bay. Suppl. Determination at 4. When vessels approach the bay from the sea, they navigate through two jetties and over a bar on the ocean floor. *Id.* (citing A.R. 1878-79). As a result of this geography, "[t]he seas in the Humboldt Bay bar entrance are generally more severe than other nearby seas." *Id.* (citing A.R. 1781, 1911). This area, referred to as the "rock and roll alley," is where the incident occurred. *See Bean Dredging*, 699 F. Supp. 2d at 128. Based upon these considerations, the NPFC reasonably concluded "the seas in the area where the casualty occurred could have been expected to be higher than those predicted in the NWS forecast[s]"—that is, in excess of ten feet. Suppl. Determination at 13. While other inferences arguably could have been drawn from the record, the NPFC's inference was not arbitrary or capricious.

Furthermore, after drawing this inference, the NPFC did not conclude that the NWS forecasts alone established that significant wave heights were actually in excess of ten feet in the area where the incident occurred. Rather, it merely concluded that the forecasts were *some* evidence that the significant wave heights facing the Stuyvesant exceeded the ten-foot restriction. Suppl. Determination at 13. The NPFC committed no error when it took this evidence into account in determining whether Bean Dredging "carried [its] burden of proof." *Id.*

Nor did the NPFC err in its assessment of the import and weight to be afforded to the separate forecast issued by the Humboldt Bay Coast Guard station—the so-called "hazardous bar broadcast." Relatively close in time to the incident, the Coast Guard reported that seas in the area of the incident were "8-10ft occasional 12ft." A.R. 102. Bringing its discretion to bear on the meaning to be drawn from the forecast, the NPFC sensibly concluded that the Coast Guard's stated range, coupled with a further reference to seas "occasionally" in excess of that range, was

"not a model of clarity." Suppl. Determination at 13. Thereafter, weighing the Coast Guard's

hazardous bar forecast against the master's statements and the Coast Guard's independent

finding in the MCIR that seas in the area were as high as twelve feet at the time of the incident,

the NPFC reasonably concluded that the hazardous bar forecast did not support Bean Dredging's

position. *Id.* While "reasonable minds could differ" as to the import of the Coast Guard's

hazardous bar broadcast and its relationship to the other evidence in the administrative record,

*Domestic Secs., Inc. v. Secs. & Exch. Comm'n*, 333 F.3d 239, 249 (D.C. Cir. 2003), the NPFC's

determination in this regard was considered and informed and had a rational basis. In other

words, it was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance

with law.

### B. The NPFC's Denial of Bean Dredging's Claim for Reimbursement Was Not Arbitrary or Capricious

In dedicating the lion's share of its moving papers to challenging the evidentiary

determinations made by the NPFC, Bean Dredging loses sight of the larger picture. Taking a

step back, there is a fundamental problem carrying throughout Bean Dredging's papers—namely,

Bean Dredging's failure to fully acknowledge that it had the burden of proof of establishing its

entitlement to reimbursement on the administrative level and the fact that it has the burden of

proof of establishing agency error now.

In enacting the OPA, Congress created a default presumption assigning liability to the

owners and operators of vessels that discharge oil into the navigable waters of the United States.

33 U.S.C. § 2702(a). At the same time, Congress contemplated that there could be situations

where responsible parties should be able to limit their damages, and crafted a mechanism for

addressing those situations—the claim for reimbursement. *Id.* § 2708(a). Nevertheless,

consistent with its intent to "internalize the costs of spills within the petroleum industry," *Rice*, 250 F.3d at 266, Congress explicitly placed the burden of proof on the responsible party to establish its entitlement to a limitation of liability. The OPA provides, in relevant part, that a responsible party "may assert a claim for removal costs and damages . . . only if *the responsible party demonstrates* that . . . [it] is entitled to a limitation of liability under section 2704 of this title," 33 U.S.C. § 2708(a)(2) (emphasis added); *see also Water Quality Ins. Syndicate v. United States*, 632 F. Supp. 2d 108, 113 (D. Mass. 2009) (concluding that "the plain language of the statute" places the burden on the responsible party to prove that it is entitled to a limitation of liability). In this case, Bean Dredging had the burden of showing that the Humboldt Bay oil spill was not "proximately caused by . . . the violation of an applicable Federal safety, construction, or operating regulation by[] the responsible party."[9] 33 U.S.C. § 2704(c)(1)(B).

While Bean Dredging concedes that it had the burden of proof on the administrative level, Pl.'s Suppl. Mem. at 1, it fails to fully acknowledge what that means for the NPFC's determination and the Court's review of that determination. Indeed, by largely ignoring the allocation of the burden of proof issue, Bean Dredging misconstrues the very basis of the NPFC's determination. Strictly speaking, the NPFC did not determine that the Humboldt Bay oil spill was proximately caused by the Stuyvesant's violation of the applicable regulations—in

_____

[9] The Court is mindful that a formulation essentially asking a party to disprove proximate causation is somewhat anomalous, but this allocation of the burden is mandated by the plain language chosen by Congress, 33 U.S.C. §§ 2704, 2708, consistent with Congress' intent to impose "strict liability" on responsible parties, H.R. Rep. No. 101-653, at 102 (1990) (Conf. Rep.), in accordance with Congress' view that a limitation on liability is a "benefit," S. Rep. No. 101-94, at 14 (1989), and has precedent in maritime law, *see Petersen v. Head Constr. Co.*, 367 F. Supp. 2d 1072, 1079 (D.D.C. 1973). In any event, for purposes of the instant action, Bean Dredging has conceded that it had the burden of proof on the administrative level. Pl.'s Suppl. Mem. at 1.

particular, the significant wave height restriction. Rather, the NPFC found, after weighing the evidence in the record and assessing its probative value, that Bean Dredging had simply failed to carry its burden of proving that it was entitled to a limitation of liability under 33 U.S.C. § 2704. Suppl. Determination at 14. In particular, the NPFC concluded that Bean Dredging failed to establish, by "[t]he preponderance of the credible evidence," that the Stuyvesant "complied with the operating restrictions in 46 C.F.R. § 44.340 and its Coastwise Load Line Certificate" or that "any violation of the regulation or the certificate did not proximately cause this oil spill." Suppl. Determination at 14.

Given the allocation of the burden of proof on the administrative level, and the basis of the NPFC's determination, Bean Dredging is misguided when it frames the inquiry as whether there was "a lack of sufficient evidence to support a finding that it violated the sea height regulation or that a violation was the proximate cause of the casualty." Pl.'s Suppl. Mem. at 2. Instead, the proper question is whether, after taking into account all the competent evidence in the administrative record, there was a reasonable basis for the NPFC to conclude that anything less than a preponderance of such evidence showed that the Humboldt Bay oil spill was not "proximately caused by . . . the violation of an applicable Federal safety, construction, or operating regulation by[] the responsible party." 33 U.S.C. § 2704(c)(1)(B). This is decidedly not a high threshold for lawful agency action and, given that the "arbitrary or capricious" standard of review is highly deferential to the agency and begins with the presumption that the agency's action was valid, the Court cannot say that the NPFC's determination that Bean Dredging failed to meet its burden of proof was arbitrary or capricious. Understandably, Bean Dredging disagrees with the NPFC's decision, but the standard of review is clear: the decision

need not be "the only reasonable one, or even that it is the result [the court] would have reached had the question arisen in the first instance in judicial proceedings." *Am. Paper Inst.*, 461 U.S. at 422. In this case, the NPFC examined the relevant data, articulated a satisfactory explanation for its action, and provided a rational connection between the facts found and the choice made. Where, as here, reasonable minds could differ on some issues, the mere fact that two inconsistent conclusions can be drawn from the record does not render the agency's decision arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law. *Domestic Secs.*, 333 F.3d at 249. This Court declines to substitute its judgment for the informed, considered, and reasonable decision of the agency entrusted by Congress to make such determinations.

Even assuming, *arguendo*, that the relevant inquiry is whether there was sufficient support in the record for the NPFC to conclude that the Stuyvesant was operating in violation of the applicable regulations and that such violations were a proximate cause of the oil spill, the NPFC's determination would still survive under the deferential "substantial evidence" standard guiding this Court's review.[10] To meet this standard, there must be "more than a scintilla" but something less than a preponderance of the evidence supporting the agency's position. *Florida Gas Transmission Co. v. Fed. Energy Regulatory Comm'n*, 604 F.3d 636, 645 (D.C. Cir. 2010) (internal quotation marks omitted). In this case, the NPFC's determination rested on, *inter alia*, the following: the master's contemporaneous statements that the seas facing the Stuyvesant at the

_____

[10] While the "substantial evidence" standard of review identified in the APA is confined to the formal adjudication context, 5 U.S.C. § 706(2)(E), the United States Court of Appeals for the District of Columbia Circuit has provided that agency action may also be said to be "arbitrary and capricious if its factual determinations lack substantial evidence," *Cablevision Sys. Corp. v. Fed. Commc'ns Comm'n*, 597 F.3d 1306, 1311 (D.C. Cir. 2010) (internal quotation marks and notations omitted).

time of the incident exceeded ten feet, by as much as 20%; Bean Dredging's concession that the Stuyvesant was facing at least occasional swells in excess of ten feet; the master's decision to curtail the Stuyvesant's operations early based on deteriorating weather conditions; the worsening weather conditions on the day of the incident; the Coast Guard's determination in the MCIR that wave heights were twelve feet both before and after the incident; the weather forecasts predicting that seas in a twenty-nautical-mile area would be at ten feet coupled with the fact that the Stuyvesant was operating in the more volatile "rock and roll alley;" the undisputed fact that the Stuyvesant rolled significantly during the turn that caused the damage to the Stuyvesant's oil fuel tank; and that the crew of the Stuyvesant had previously shown their awareness of the risks associated with operating in comparable seas by curtailing operations under similar circumstances. Suppl. Determination at 12-14. Upon such a record, the Court cannot say that a determination that the Stuyvesant was operating in "[s]eas . . . more than 10 feet," 46 C.F.R. § 44.340(a)(1), in violation of its "load line certificate," *id.* § 42.09-1(c), is unsupported by substantial evidence.

The NPFC did not render its decision in a vacuum. Much of the evidence concerning the events in question was compiled after the fact or was in Bean Dredging's possession, custody, or control, and necessarily required making certain inferences as to events that transpired with less than ideal information. Understandably, Bean Dredging has its own view as to what transpired on September 6, 1999, and "[w]hile this is certainly one possible view of what happened," the question the Court "face[s] is not whether [Bean Dreding's] view of the facts supports its version of what happened, but rather whether the [agency's] interpretation of the facts is reasonably defensible." *J.A. Jones Mgmt. Servs. v. Federal Aviation Admin.*, 255 F.3d 761, 765 (D.C. Cir.

2000). The Court finds that the NPFC's determination is based on "such relevant evidence as a reasonable mind might accept as adequate to support [its] conclusion." *Kornman v. Secs. & Exch. Comm'n*, 592 F.3d 173, 184 (D.C. Cir. 2010). The NPFC's determination is the model of reasoned agency decisionmaking: the NPFC examined the relevant data, articulated a satisfactory explanation for its action, and provided a rational connection between the facts found and the choice made; it brought its expertise to bear on the important aspects of the issue, and its determination is not so implausible that it cannot be ascribed to a difference of view or agency expertise or characterized as a clear error of judgment. In short, the determination was not arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

### V. CONCLUSION

The Court has considered the remaining arguments tendered by the parties and has concluded that they are without merit. Therefore, and for the reasons set forth above, the Court shall DENY Bean Dredging's [30] Motion for Summary Judgment, GRANT the United States' [31] Motion for Summary Judgment, and DISMISS this action in its entirety.

Date: March 29, 2011

_____/s/_____

**COLLEEN KOLLAR-KOTELLY**
United States District Judge